## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-750-RM-SKC

SCOTT PETERS

Plaintiff,

v.

CITY AND COUNTY OF DENVER;
DANIEL RODRIGUEZ, Denver Sheriff Department Deputy, in his individual capacity;
MOHAMMED MOHAMMED, Denver Sheriff Department Deputy, in his individual capacity;
MICHAEL FITZMAURICE, Denver Sheriff Department Deputy, in his individual capacity;
JAMES CASIAS, Denver Sheriff Department Sergeant, in his individual capacity;
BILLIE HUMBLES, Denver Sheriff Department Deputy, in his individual capacity;
IAN SCHIFFHAUER, Denver Sheriff Department Deputy, in his individual capacity;
MICHAEL BENNETT, Denver Sheriff Department Sergeant, in his individual capacity;
CHERIF SARR, Denver Sheriff Department Deputy, in his individual capacity;
NOREEN ROBERSON, Denver Sheriff Department Deputy, in her individual capacity;

Defendants.

---

## RESPONSE TO ECF NO. 46,
## CITY AND COUNTY OF DENVER'S MOTION TO DISMISS PLAINTIFF'S SECOND CLAIM FOR RELIEF IN SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, Scott Peters, requests this Court deny Denver's Motion to Dismiss in its entirety.

### INTRODUCTION

On April 25, 2021, Mr. Peters entered the Denver Downtown Detention Center in a wheelchair minutes after his release from Denver Health. He was heavily sedated, barely conscious, unable to stand, walk, or speak. Within minutes of arriving at the jail, Denver Sheriff Department ("DSD") deputies began yelling at Mr. Peters to get out of the wheelchair and enter a

1

jail cell. Mr. Peters was too sedated to respond. When Mr. Peters failed to comply with orders he couldn't comprehend, Defendants pulled him from his wheelchair and dragged him into a jail cell. Inside that cell, at least six deputies held Mr. Peters on the ground while another deputy, Defendant Daniel Rodriguez, twisted nunchucks around Mr. Peters' arm so hard that he broke Mr. Peters ulna and severed multiple arteries. Defendants then left Mr. Peters nonresponsive on the ground, wedged beneath a toilet as his arm turned pale and cold. Mr. Peters is now permanently disabled.

At the time of this incident, Denver had an unconstitutional policy authorizing DSD deputies to use excessive force on passively resistant inmates such as Mr. Peters, who were experiencing altered mental states, including from medical sedation. Denver trained its deputies to carry out this unconstitutional policy. When Defendant Rodriguez used his nunchucks on a barely conscious man who was unable to comply with orders to stand up or respond to pain, he did so because Denver's unconstitutional policy and training told him this was permissible.

## FACTUAL ALLEGATIONS SUPPORTING LIABILITY

On April 25, 2021, Denver Police Department officers encountered Mr. Peters in an altered mental state, arrested him for possession of a small amount of controlled substances, and had him transported to Denver Health hospital, where he was heavily sedated as part of his treatment. Approximately 4 hours later, hospital staff released Mr. Peters into Denver's custody for transport to the Denver Downtown Detention Center. ECF 32 ¶¶ 42-43. Four DSD deputies wheeled Mr. Peters out of the hospital in a wheelchair. ECF 32 ¶ 45. At that time Mr. Peters was sedated, unable to hold his head up, get out of the wheelchair, walk, or stand. ECF 32 ¶¶ 45, 47. The deputies put Mr. Peters into the back of a jail transport van. ECF 32 ¶ 52. Mr. Peters was catatonic and obviously under the effects of the powerful sedatives. ECF 32 ¶ 51.

2

At 10:35 pm, the van arrived at the Denver Downtown Detention Center. ECF 32 ¶ 54. As deputies wheeled him into the jail, Mr. Peters sat slouched and sedated in the wheelchair; he wasn't aggressive or combative, and he didn't try to assault any of the deputies or resist. ECF 32 ¶¶ 63, 66-67. Defendant Rodriguez wheeled Mr. Peters towards cell I-2, where nine deputies surrounded him. ECF 32 ¶¶ 68-70. The Defendants began ordering Mr. Peters to "stand up" and "lay down." ECF 32 ¶ 71. However, Mr. Peters couldn't stand; he was non-verbal, drooling, and unable to comply. ECF 32 ¶¶ 74, 75. When Mr. Peters didn't respond, one of the Defendants grabbed Mr. Peters, ripped him out of the wheelchair, and dragged Mr. Peters into cell I-2 where at least 7 defendants piled on Mr. Peters and restrained him on the cell floor. ECF 32 ¶¶ 77-78, 80.

Inside the cell, Defendant Mohammed wrapped nunchucks around Mr. Peters' legs or ankles while Defendant Casais put Mr. Peters in a gooseneck hold restraining Mr. Peters' left arm. ECF 32 ¶¶ 81, 82. Defendant Casias then told Defendant Rodriguez to use nunchucks on Mr. Peters. ECF 32 ¶ 83. Defendant Rodriguez positioned the nunchucks around Mr. Peters' right arm and began cranking on them harder and harder as Mr. Peters lay on the floor, barely conscious and nonresponsive. ECF 32 ¶¶ 84-85. As Defendant Rodriguez continued squeezing the nunchucks around Mr. Peters' arm, Defendant Rodriguez knew that he was dealing with a man who was heavily sedated, couldn't stand on his own, and couldn't speak. ECF 32 ¶ 86. Defendant Rodriguez believed Mr. Peters to be in an altered mental state as the result of intoxication, sedation, or a seizure. ECF 32 ¶ 87. Despite Mr. Peters nonresponsive state, nonverbal condition, and inability to shout out in pain, Defendant Rodriguez continued to crank on the nunchucks so hard that they broke Mr. Peters' right arm and severed multiple arteries. ECF 32 ¶¶ 88-91.

Defendants exited the cell and left Mr. Peters there motionless, lying behind a toilet, until

Denver paramedics arrived to transport Mr. Peters back to Denver Health where he underwent emergency surgery. ECF 32 ¶¶ 94-95, 108, 112. Mr. Peters suffered permanent disfigurement. ECF 32 ¶¶ 117-120. Defendant Rodriguez caused these injuries ECF 32 ¶¶ 119-120.

On April 25, 2021, DSD's formal Use of Force Policy 3(b)(i)(1) read: "OPNs may be used: In response to passive resistance." ECF 32 ¶ 132. DSD's formal Use of Force Policy 4(B)(3) defined "passive resistance" as "physical actions that prevent a deputy's attempt to control an individual, including, but not limited to, an individual who remains in a limp, prone position." ECF 32 ¶ 131. Section 3(b)(ii) of DSD's formal Use of Force Policy explicitly described three situations when OPN nunchucks shall not be used:

> [1] in response to psychological intimidation or verbal non-compliance; (2) as an impact tool on an individual who is not engaging in active aggression or aggravated active aggression except to make someone release a hold on a fixed object; or (3) when lethal force is not authorized under this Use of Force Policy: to choke an individual; or to strike an individual's head, neck, throat, collarbone, chest/breasts, genitalia, spinal column, sternum, solar plexus, or kidney.

ECF 32 ¶¶ 134-135. Under DSD's policy and DSD's actual day-to-day practices, other than these three exceptions, DSD deputies may use OPN nunchucks in response to passive resistance and may use them by wrapping them around a person's limb and cranking down even when that person is experiencing a medical emergency, is nonresponsive, or has gone limp. ECF 32 ¶ 136. Denver knew that using nunchucks causes extreme pain and can inflict intense injury, including by breaking bones, because Denver was aware of at least two previous cases where Denver law enforcement agents used nunchucks on passively resistant people resulting in serious bodily injuries, including a broken leg and lacerations requiring staples. ECF 32 ¶¶ 137-145. Denver also continued to know that DSD's Use of Force Policy and DSD's actual day-to-day practices authorized its deputies to use nunchucks in a manner that causes extreme injury to people who

merely passively resist, including by being limp. ECF 32 ¶ 146.

Denver trained its deputies, including Defendants, to use nunchucks as a pain compliance tool against passively resistant people, including people experiencing altered mental states or who appeared nonresponsive and incoherent, like Mr. Peters, as such a use of the nunchucks was permitted pursuant to policy and practice. ECF 32 ¶ 162. DSD trained its deputies to use nunchucks as a pain compliance tool on people who could not verbally respond, as such a use of the nunchucks was permitted pursuant to policy and practice. ECF 32 ¶ 164. Denver trained its deputies, including the Defendants, that they were permitted to use nunchucks on passively resistant, defenseless, limp inmates like Mr. Peters. ECF 32 ¶¶ 161-174. Following this training and a sergeant's direction to use nunchucks on a passively resistant inmate, Defendant Rodriguez used nunchucks on Mr. Peters arm to overcome his passive resistance. ECF 32 ¶ 172. When Mr. Peters didn't verbalize the pain he was experiencing, Defendant Rodriguez, in accordance with his training, continued applying increasing amounts of pressure to Mr. Peters' arm causing his ulna to break and severing his arteries. ECF 32 ¶ 173. In response to this incident, Denver did not discipline Deputy Rodriguez for using nunchucks on an incapacitated inmate. ECF 32 ¶ 153. Denver did not discipline Defendant Mohammed for using nunchucks on incapacitated Mr. Peters either. ECF 32 ¶ 157. DSD's Use of Force Policy and actual day-to-day practices authorized Defendants to use nunchucks on passively resistant people, including those experiencing altered mental states like medical sedation  who can't walk, stand, or speak. ECF 32 ¶ 171.

## STANDARD OF REVIEW

There is a strong presumption against the dismissal of claims under Rule 12(b)(6). *Cottrell, Ltd. v. Biotrol Intern., Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999). Evaluating a 12(b)(6) motion,

a court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1201 (10th Cir. 2003). Generally, a complaint will survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

## ARGUMENT

I.    **Mr. Peters has properly pleaded his cause of action against Denver alleging excessive force under 42 U.S.C. § 1983.**

### A.  Legal standards

Under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), a government entity may be liable for constitutional violations committed by its employees. In addition to pleading an underlying constitutional violation, a *Monell* claim of municipal liability requires pleading three elements: "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Regarding the official policy or custom element:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and

> approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

Excessive force claims are analyzed under the objective reasonableness standard of the Fourth Amendment. *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001). Use of force is analyzed according to the *Graham* factors, which includes but is not limited to considering (a) the severity of the crime at issue, (b) whether the suspect poses an immediate threat to officers or others, and (c) whether the suspect is actively resisting or attempting to evade the arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). Additionally, courts consider the degree of force used in determining if an officer's use of force was unreasonable. *Rucker v. Hampton*, 49 F. App'x 806, 809 (10th Cir. 2002) ("[A]n assessment of the degree of force actually used is critical to the balancing test used to determine if the force was excessive." (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

### B.  Denver's unconstitutional policy

#### 1.  Mr. Peters properly pleaded that Denver's formal use of force policy is facially unconstitutional concerning the use of OPNs

To properly plead the existence of an unconstitutional policy, a complaint may point to a policy officially adopted or promulgated by the municipality. *Bryson*, 627 F.3d at 788. When alleging municipal liability, a plaintiff can satisfy his burden by demonstrating that an official policy is facially unconstitutional. *Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204, 1210 (10th Cir. 2020). "When an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "A

county's sanctioning of a facially unlawful policy establishes that it was the moving force behind the injury of which the plaintiff complains." *Hinkle*, 962 F.3d at 1204. "Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy but was also aware that a constitutional violation will most likely occur." *Id.* at 1240.

Denver concedes that if "the Written Policy authorized officers to use force, including OPN, on individuals who were non-responsive for medical reasons… such authorization would be facially unconstitutional." ECF 46 at 7. As pleaded, Denver's written policy does just that. The Complaint therefore properly alleges that Denver had an unconstitutional policy authorizing deputies to use nunchucks on passively resistant persons, including persons who were limp, prone, or experiencing altered mental states including medical sedation. ECF 32 ¶¶ 130-131, 171.

As alleged, DSD's use of force policy authorizes deputies to use OPNs on non-responsive, passively resistant persons. ECF 32 ¶¶ 131-33; *See also* Ex. 1 (DSD's use of force policy). Mr. Peters' understanding, expressed in his operative complaint, is that Denver's use of force policy is not the document Denver attached to its Motion to Dismiss. That exhibit is a DSD Order. ECF 46-1, at 1. The excerpt of the DSD Order that Denver referred to in its Motion to Dismiss does not contain the language about OPN nunchucks quoted from DSD's official policy contained in Mr. Peters' Complaint. *Compare* ECF 46-1, *with* Ex. 1. This Court should disregard ECF 46-1 as it is not the document referred to in Mr. Peters' operative complaint and Mr. Peters disputes its authenticity. *See Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014) ("A district court may consider documents (1) referenced in a complaint that are (2) central to a plaintiff's claims, and (3) indisputably authentic when resolving a motion to dismiss"). The Court should instead assess

Mr. Peters' allegations based on the use of force policy referred to in Mr. Peters' Complaint and attached to this Response as Exhibit 1.

Pursuant to Mr. Peters' complaint and the use of force policy attached to this response, DSD's use of force policy section 3(b)(i)(1) states, "OPNs may be used: In response to passive resistance." ECF 32 ¶ 130. Section 4(B)(3) of that policy defines "passive resistance" as "physical actions that prevent a deputy's attempt to control an individual, including, but not limited to, an individual who remains in a limp, prone position." ECF 32 ¶ 131. Section 3(b)(ii) enumerates specific orders concerning when nunchucks cannot be used.  ECF 32 ¶ 135. Under section 3(b)(ii), deputies are prohibited from using nunchucks: "(1) In response to psychological intimidation or verbal compliance; (2) As an impact tool on an individual who is not engaging in active aggression or aggravated active aggression except to make someone release a hold on a fixed object; or (3) When lethal force is not authorized under this Use of Force policy." *Id.* Section 3(b)(i) does not bar deputies from using nunchucks on nonresponsive or incapacitated individuals. *Id.*; *United States v. Sanders,* 796 F.3d 1241, 1250 (10th Cir. 2015*)* (applying negative implication canon to police impoundment policy). Denver's claim that a "fair reading" of the policy shows it prohibits using nunchucks on medically sedated, incapacitated individuals is incorrect. ECF 46 at 8.

Denver asserts that Mr. Peters' factual allegations are contradicted by the written policy because "[p]rior to using force, the written policy instructs officers":

> that there are many reasons why an individual may be unresponsive or resistant, including that the individual's mental state may prevent them from understanding the command or actions and the individual may not be deliberately attempting to resist. When circumstances permit, deputies should consider reasons why an individual is unresponsive and attempt to utilize non-force alternatives.

ECF 46 at 8; ECF 46-1 at  2, 6(A)(8). This language does not appear in DSD's use of force

policy. *See* Ex. 1. This language is from section 6(A)(8) of the DSD Order contained in ECF 46-1 and should be disregarded. *Kaven*, at 1197.

Should the Court consider ECF 46-1 as Denver's use of force policy, that order does not contain the limiting language Denver claims. Denver added the phrase "[p]rior to using force" to its motion, but this language is not contained in section 6(A)(8). 46-1 at 2. The actual language of ECF 46-1 does not <u>require</u> DSD deputies to consider a person's mental state and ability to understand commands before using force; instead, it <u>suggests</u> it, when circumstances permit.

Further even if section 6(A)(8) of ECF 46-1 did begin with the qualifier, "prior to using force, the written policy instructs officers," it still does not prohibit deputies from using nunchucks in response to passive resistance, including on persons, like Mr. Peters who were nonresponsive due to medical sedation. *Id.* That subsection (along with similar language Mr. Peters agrees exists in the document he cites as DSD's use of force policy) merely tells deputies to consider certain factors. It prohibits nothing. Under DSD's use of force policy, deputies may consider why a person like Mr. Peters can't stand, walk, speak, or respond, and after making those considerations still choose to use OPN on that person.

Although Mr. Peters disputes the authenticity of ECF 46-1 and asserts that, based on his present knowledge, Exhibit 1 is DSD's use of force policy in effect at the time of the incident, both documents permit using OPN as a pain compliance technique on passively resistant inmates. The DSD Order Denver attached as ECF 46-1 defines passive resistance as "physical actions that do not prevent a deputy's attempt to exercise control of the person or place them in custody, for example, a person who remains in a limp or prone position." 46-1, at 7 Appendix A. The Order then lists "OPN (pain compliance techniques)" as an acceptable response to passive resistance. *Id.*

As Mr. Peters has pleaded, section 3(b)(i)(1) of DSD's use of force policy explicitly states "OPNs may be used: In response to passive resistance", and in Denver's actual day-to-day practices deputies use nunchucks to overcome the passive resistance of nonresponsive, medically sedated individuals like Mr. Peters. ECF 32 ¶ 130, 171. In sum, ECF 46-1, Denver's use of force policy as pleaded in Mr. Peters' complaint, and Exhibit 1 each permit the unconstitutional use of force Denver's deputies inflicted on Mr. Peters. Based on Denver's concession that such a policy is facially unconstitutional, Mr. Peters has properly pleaded his cause of action against Denver.

Mr. Peters further alleged that DSD's Use of Force Policy is facially unconstitutional because on its face, the policy authorizes excessive force. Under *Graham*, force is excessive when an officer's use of force is objectively unreasonable in light of the facts and circumstances confronting him. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Mr. Peters alleged a policy authorizing deputies to crank nunchucks around the limbs of passively resistant nonresponsive inmates until their bones break. ECF 32 ¶ 91, 164. According to DSD's use of force policy, a passively resistant person is a person who is limp or in a prone position. ECF 32 ¶ 131. DSD's Use of Force Policy authorizes deputies to use a bone breaking degree of force against an individual who has merely gone limp, even if he went limp due to a medical issue. While a policy authorizing deputies to use such extreme force when arresting persons for severe offenses, who threaten officers, or who engage in active resistance may be upheld as constitutional under *Graham*, the Complaint demonstrates that Denver's policy disregards *Graham* by allowing extreme force to be used against passive, rather than active resistance. The Complaint states a plausible claim that Denver's official policy authorized deputies to use objectively unreasonable force.

As the issues of culpability and causation are straightforward where plaintiff properly

pleads a facially unconstitutional policy, Mr. Peters' Complaint sufficiently alleges that Defendant Denver, in promulgating and teaching its unconstitutional policy, was the moving force behind and cause of Mr. Peters' injuries. ECF ¶ 171-72, 187.

### 2. Mr. Peters has properly pleaded Denver's deliberate indifference to the constitutional violations its policy produces

Should this Court find that Mr. Peters failed to properly plead that DSD's use of force policy is facially unconstitutional, his Complaint also pleads facts sufficient to establish Denver's deliberate indifference to the inevitable constitutional violations that flow from its policy such that he has still properly pleaded his claim against Denver.

To plead deliberate indifference based on a policy, a plaintiff may allege that the municipality had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation … and … consciously or deliberately [chose] to disregard the risk of harm." *Barney*, 143 F.3d at 1307. A plaintiff can establish deliberate indifference by a showing that the municipality's policy caused its employees to engage in "a pattern of tortious conduct" or that "a violation of federal rights is a highly predictable or plainly obvious consequence" of a municipality's policy. *Hinkle*, 962 F.3d at 1241. To establish that a policy causes constitutional violations, a plaintiff can plead a pattern of multiple similar instances of misconduct; "no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible." *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 U.S. Dist. LEXIS 161600, at *6 (D. Colo. Dec. 2, 2015).

### i. Denver's pattern of tortious conduct

Relying on W*aller v. City & County of Denver*, 932 F.3d 1277, 1285-86 (10th Cir. 2019),

Denver claims Mr. Peters failed to allege a pattern of tortious conduct because he "relies on two incidents to plead deliberate indifference" and "[t]his Court cannot consider the first incident." ECF 46 at 9-10. This assertion is incorrect. In *Waller*, a pretrial detainee at the Denver Jail sued a DSD deputy for excessive force and raised a *Monell* claim against Denver. *Id.* at 1280. The plaintiff in *Waller* filed an original complaint, an amended complaint, and a second amended complaint. *Id.* at 1281. In the original complaint and amended complaint, the plaintiff pleaded facts alleging DPD's prior instances of excessive force to establish a pattern of tortious conduct by Denver. *Id.* at 1287. The plaintiff later filed a second amended complaint removing these allegations. *Id.* at 1282. The Tenth Circuit did not disregard plaintiff's factual allegations about DPD's prior instance of tortious conduct because the conduct of DPD officers cannot be relevant to whether Denver was deliberately indifferent. *Waller*, at 1287. The 10th Circuit disregarded the original complaint's allegations regarding DPD officers because "these allegations were removed from the original complaint at Mr. Waller's request." *Id.*

Importantly, based on how the *Waller* plaintiff framed the issue on appeal, the dicta Denver cites from *Waller* is inapplicable to Mr. Peters' case. In *Waller*, the court noted that even if the plaintiff's allegations of DPD's similar instances of tortious conduct had remained in the complaint, they would have been irrelevant. *Id.* This statement was correct, but not for the reason Denver asserts. Properly understood, this dicta from *Waller* should not affect the Court's decision.

Under the party presentation principle, it is well established that parties frame the issues for courts to decide. *Colorado v. United States EPA*, 989 F.3d 874, 885 (10th Cir. 2021). In *Waller* the issue the plaintiff presented on appeal was whether Plaintiff's complaint "allege[d] sufficiently plausible municipal liability claims against the City and County of Denver for unconstitutionally

deficient policies and/or practices with respect to hiring, training, supervision, and discipline of Denver's Deputy Sheriffs." *See* Exhibit 2 (*Waller* Appellant's Opening Br.) at 4. The *Waller* plaintiff thus only asserted a *Monell* claim regarding Denver's hiring, supervision, and discipline of its Sheriffs, not of all its law enforcement officers. When the court in *Waller* stated that allegations of Denver police officers' similar misconduct would be irrelevant, it did so because the plaintiff limited his *Monell* claim only to Denver's Sheriffs, not because evidence from a city's police department cannot be used to plead municipal liability against a city's sheriff department.

A contrary reading of *Waller* would be illogical, because DPD and DSD are not separate legal entities capable of possessing different knowledge. Mr. Peters' claim is against Denver, not DSD. DPD and DSD are each a part of Denver. *See, e.g.*, *Snyder v. Denver Sheriff*, No. 15-cv-02169-GPG, 2015 U.S. Dist. LEXIS 168859, at *1 (D. Colo. Dec. 16, 2015) ("It is well-established that a plaintiff's claims against the Denver Sheriff and Denver Police Department are construed as claims against the City and County of Denver."); *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985). Denver knows what Denver knows regardless of whether Denver learned about it from its police officers versus its deputies breaking passively resistant persons' bones with nunchucks. For the reasons stated above, Denver's citation to dicta from *Waller* does not counsel otherwise. As a result, Mr. Peters is not, as Denver claims, relying on "only a single incident…[to] describe a pattern of violations." ECF 46 at 10.

By alleging a history of past instances of highly similar misconduct by Denver's law enforcement, each of which included the specific fact pattern of Denver law enforcement using nunchucks as a pain compliance technique on a passively resistant person and/or one experiencing an altered mental state, Mr. Peters properly pleaded Denver's actual notice of an informal custom

or policy. First, in citing the *Mayek* case where Denver officers used nunchucks on a person experiencing an altered mental state and cranked on them until the officer broke Mr. Mayek's leg, Mr. Peters adequately pleaded a prior similar instance of tortious conduct that put Denver on notice that its policies and actual day-to-day practices caused unconstitutional excessive force. ECF 32 ¶ 138-142. Mr. Peters also pleaded a second highly similar instance of a Denver deputy misusing nunchucks in a manner amounting to excessive force, the 2020 Deputy Burgos incident. ECF 32 ¶ 143. The Deputy Burgos incident involved an inmate, who like Mr. Peters, was lying down on the jail cell floor, limp, and passively resistant when Deputy Burgos used nunchucks to badly injure the inmate. *Id*. Acknowledging that Deputy Burgos used the nunchucks to strike the passively resistant inmate rather than crank them around inmate's limbs, Denver's policy nonetheless authorized Deputy Burgos to use nunchucks on a passively resistant inmate, causing excessive force. ECF 32 ¶ 143. These two incidents put Denver on notice that its customs and practices were causing excessive force.

Mr. Peters need not plead a set number of cases to properly allege a pattern of tortious conduct. Although at this early stage of his case, Mr. Peters relies on these two similar instances to allege a similar pattern of tortious conduct, the high degree of similarity between these incidents sufficiently pleads a pattern of violations supporting an inference of deliberate indifference.

### ii.    Highly predictable that Denver's policy would result in constitutional violations

Denver asserts that Plaintiff's allegations are insufficient to show that the alleged constitutional violation was a highly predictable or plainly obvious consequence of Denver's policy. ECF 46 at 10. However, as the Complaint alleged, a policy that explicitly authorizes deputies to use nunchucks for purposes of achieving pain compliance on people who can neither

speak nor respond will inevitably result in instances of unconstitutional excessive force. ECF 32 ¶ 142, 150, 162, 187, 191. It is plainly obvious that a policy authorizing deputies to use nunchucks on passively resistant limp people, who like Plaintiff were involuntarily sedated, will lead inevitably to situations like the one described in Mr. Peters' Complaint. A non-responsive or highly sedated person cannot respond to a pain compliance technique involving the torquing of nunchucks around the person's limbs. Plaintiff sufficiently alleged facts to establish the high predictability of the constitutional violations he suffered because of Denver's obviously unconstitutional policy.

### C. Denver's unconstitutional custom or practice

"Municipal liability may be based . . . on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010). To plead that a widespread practice or custom constitutes a municipal policy, a plaintiff may either rely on "a pattern of multiple similar instances of misconduct" or on "other evidence." *Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1070 (D. Colo. 2021) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)). "No set number [of similar instances] is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible." *Arakji*, 2015 U.S. Dist. LEXIS 161600, at *18. For example, in *Estate of Valverde v. Dodge*, the court denied defendants' motion to dismiss a *Monell* claim alleging a widespread custom and practice where the plaintiff plausibly demonstrated the existence of a custom and practice resulting in the use of excessive force by alleging three prior instances of similar misconduct. No. 16-CV-1703-

MSK-MEH, 2017 U.S. Dist. LEXIS 131402, at *13 (D. Colo. Aug. 17, 2017).

Even relying on two similar incidents of prior misuse of nunchucks, Mr. Peters' Complaint sufficiently alleges a widespread custom or practice of using nunchucks on passively resistant persons resulting in excessive force. The Complaint shows that on at least two prior instances, Denver law enforcement agents engaged in excessive force with nunchucks against passively resistant people or those experiencing an altered mental state. Mr. Peters' Complaint establishes the high degree of factual similarity between the *Mayek* and *Burgos* incidents and the incident described in Mr. Peters' Complaint. *See* Part I.B.2.i, *infra*. In the first prior instance, Mr. Peters sufficiently alleged that Denver law enforcement agents used nunchucks on Mr. Mayek, a person experiencing an altered mental state, resulting in his bones breaking. ECF 32 ¶ 138. Mr. Peters' Complaint included footnote 2, which linked to an article describing Mr. Mayek's excessive force incident including an embedded video still capturing the cranking motion Denver law enforcement used in deploying the nunchucks on Mr. Mayek's leg, breaking his bone. *Id.* The second instance, the Burgos case where a DSD deputy used nunchucks on a passively resistant inmate who was lying on the jail cell floor limp and passively resistant, is so similar to the incident described in the Complaint that it, in addition to *Mayek*, sufficiently alleges a widespread custom or practice of Denver law enforcement agents using nunchucks on passively resistant persons and/or those experiencing altered mental states.

### D.  Denver's failure to adequately train

To establish a claim for failure to train, Plaintiff must first plead that the training was, in fact, inadequate. If Plaintiff can do so, he must then satisfy the following requirements:

(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation

17

> with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000). In inadequate training cases, deliberate indifference can be shown when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003). To show deliberate indifference, a plaintiff must show "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. A showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate. *Brown*, 227 F.3d at 1286. Municipal liability can also be triggered without a pattern of similar violations when "a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for … a violation" of federal constitutional rights. *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 401 (1997).

The obvious deficiency in Denver's policy, on which DSD deputies are trained, is the policy authorizing them to use nunchucks on passively resistant individuals including those who are passively resistant due to forces outside their control, such as medical sedation. ECF 32 ¶ 161. This policy is written in 3(b)(i)(1) and 4(B)(3) of DSD's use of force policy. ECF 32 ¶¶ 131-132. The policy permits DSD deputies to violate individuals' constitutional right to be free from excessive force because it authorizes DSD deputies to use extreme force, including cranking nunchucks around inmates' limbs when they are passively, rather than actively resistant. *Id.* In

conformity with this policy, Denver trains its deputies to use nunchucks as a pain compliance tool against passively resistant people, including people experiencing altered mental states or who are nonresponsive. ECF 32 ¶ 162. Denver argues that "the Written Policy clearly and unequivocally instructs employees to consider the mental state of the individual before using force." ECF 46 at 17. DSD's use of force policy does instruct deputies to consider an inmates' mental state. *Id.* However, it then it authorizes them, after making this consideration, to use nunchucks on inmates who are in altered mental states, including nonresponsive passively resistant persons like Mr. Peters. ECF 32 ¶ 162. According to DSD deputies' training, deputies can observe a semi-conscious individual who is unable to stand or speak and, after considering these circumstances, pursuant to policy and training, use nunchucks on that person to overcome their passive resistance. Such training represents deliberate indifference to its inevitable consequences.

The Complaint alleges that Defendant Rodriguez received directions from his sergeant, and following policy, his training, and his sergeant's directions, used nunchucks on Mr. Peters' arm to overcome his passive resistance. ECF 32 ¶ 172. Defendant Rodriguez did what he was trained to do when facing the recurring situation of a passively resistant inmate: continue applying increasing amounts of pressure until the inmate complied. ECF 32 ¶ 173. Following his training, Defendant Rodriguez broke Mr. Peters' arm and severed his arteries, directly causing Mr. Peters' injuries and the constitutional violations he suffered *Id.* The Complaint properly alleges that Denver's inadequate training caused Denver's deputies to exceed constitutional limitations on the use of force, and that in instructing its deputies on this training, Denver directly caused Mr. Peters to be subjected to excessive force. The Complaint properly pleads that the need for more or different training was so obvious, and the inadequacy of Denver's use of force training so likely to result in

constitutional deprivations that the Court can infer Denver's deliberate indifference.

## CONCLUSION

Wherefore, for the foregoing reasons, Mr. Peters respectfully requests that this Honorable

Court deny Defendant's Motion to Dismiss in its entirety.

*/s Cameron Bedard*
Cameron Bedard #52362
Adam Frank #38979
Frank Law Office LLC
1133 N Pennsylvania St.
Denver, CO 80203
Phone: (303) 800-8222
cameron@franklawoffice.com
adam@franklawoffice.com

**<u>Certificate of Service</u>**

I hereby certify that on September 8, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

Kevin McCaffrey
kevin.mccaffrey@denvergov.org

Eric Ziporin
eziporin@sgrllc.com

*<u>/s Cameron Bedard</u>*
Cameron Bedard
Frank Law Office LLC